**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| BOZEL S.A., *et al.,* | : | Case No. 10-11802 (AJG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

---------------------------------------------------------------x

## <u>DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION</u>

Allen G. Kadish
Kaitlin R. Walsh
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
kadisha@gtlaw.com
walshkr@gtlaw.com

and

Mark D. Bloom
333 Avenue of the Americas, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
bloomm@gtlaw.com

Attorneys for Debtors and
Debtors in Possession

Dated: November 1, 2011

## TABLE OF CONTENTS

ARTICLE I INTRODUCTION AND SUMMARY ..................................................... 1

    1.1   Disclosure Statement Enclosures .................................................................. 1
    1.2   Purpose of the Disclosure Statement............................................................ 1
    1.3   Only Impaired Classes Vote......................................................................... 2

ARTICLE II OVERVIEW OF THE PLAN ............................................................... 2

    2.1   Introduction .................................................................................................. 2
    2.2   Summary of Distributions ............................................................................ 3

ARTICLE III OVERVIEW OF CHAPTER 11 ......................................................... 3

ARTICLE IV DEBTORS' HISTORY AND BACKGROUND................................. 4

    4.1   The Debtors.................................................................................................. 4
    4.2   Corporate History of Bozel S.A. .................................................................. 4
          (a)    The Bozel Acquisition Transactions................................................. 5
          (b)    Bozel S.A.'s Operating Subsidiaries................................................. 5
          (c)    Financial History of the Debtors....................................................... 6

ARTICLE V SIGNIFICANT EVENTS DURING THE BANKRUPTCY ................. 7

    5.1   The Bankruptcy Filings................................................................................ 7
    5.2   The Corporate Governance Action ............................................................... 7
    5.3   Investigation into the Debtors' Finances....................................................... 8
    5.4   The Sale of Bozel Brazil and Bozel Europe.................................................. 8
          (a)    Initial Marketing of Bozel S.A.'s Assets ......................................... 8
          (b)    DIP Financing and the Subsequent Marketing and Sale of Bozel
                 Brazil and Bozel Europe .................................................................. 9
    5.5   Claims Bar Dates........................................................................................ 10

ARTICLE VI SUMMARY OF PLAN PROVISIONS............................................. 11

    6.1    Introduction................................................................................................ 11
    6.2    Unclassified Administrative Claims, Priority Tax Claims and Fee Claims.......... 11
    6.3    Classification and Treatment of Claims and Interests.......................................... 12
    6.4    Acceptance or Rejection of the Plan .............................................................. 13
    6.5    Means for Implementation of the Plan ........................................................... 14
    6.6    Distributions Under the Plan ......................................................................... 16
    6.7    Conditions to Confirmation and Consummation .............................................. 20
    6.8    Treatment of Executory Contracts and Expired Leases .................................... 20
    6.9    Effect of Confirmation ................................................................................. 20
    6.10  Post-Confirmation Jurisdiction ..................................................................... 22
    6.11  Miscellaneous Provisions.............................................................................. 23

*MIA182,176,943v6*

ARTICLE VII CERTAIN RISK FACTORS TO BE CONSIDERED ......................................... 24

7.1    Taxation.............................................................................................. 25
7.2    Distributions to Holders of Claims ................................................... 25
7.3    Objections to Classification .............................................................. 25
7.4    Certain Bankruptcy Law Considerations .......................................... 25
       (a)    Risk of Non-Confirmation of the Plan.................................... 25
       (b)    Risk of Non-Occurrence of the Effective Date........................ 26
       (c)    Appeal of the Confirmation Order .......................................... 26

ARTICLE VIII CONFIRMATION OF THE PLAN ..................................................... 26

8.1    Confirmation Hearing ....................................................................... 26
8.2    Best Interests Test ............................................................................. 26
8.3    Feasibility.......................................................................................... 27

ARTICLE IX CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...... 27

9.1    Federal Income Tax Consequences in General ................................. 27
       A.     Federal Income Tax Consequences to the Debtors            28
              1.    Cancellation of Indebtedness......................................... 28
       B.     Federal Income Tax Consequences to Holders of Allowed Claims
              in Class 1A and 1B                                           29
              1.    Receipt of Cash and Property by Holders of Allowed
                    Claims in Class 1A and 1B........................................ 29
              2.    Receipt of Interest ...................................................... 29
              3.    Character of Gain or Loss ........................................... 29
              4.    Withholding................................................................. 30
       C.     Importance of Obtaining Professional Tax Assistance        30

ARTICLE X CONCLUSION ................................................................................... 31

ii

## ARTICLE I  INTRODUCTION AND SUMMARY

Bozel S.A. and Bozel, LLC (collectively, the "Debtors") submit this disclosure statement (the "Disclosure Statement"), pursuant to the provisions of title 11 of the United States Code (the "Bankruptcy Code") and applicable non-bankruptcy law, with respect to the Debtors' *Joint Chapter 11 Plan of Liquidation* for the resolution of outstanding Claims against and Interests in the Debtors (as it may be further amended and modified, the "Plan").  Unless otherwise noted, all capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and projected financial statements and notes thereto appearing elsewhere in this Disclosure Statement together with any relevant Exhibits.

### 1.1    *Disclosure Statement Enclosures*

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A)

- Liquidation Analysis (Exhibit B)

- Non-Exhaustive List of Causes of Action (Exhibit C)

### 1.2    *Purpose of the Disclosure Statement*

This Disclosure Statement is being transmitted to, among others, holders of Impaired Claims against the Debtors that are entitled to vote to accept or reject the Plan (Class 1A- General Unsecured Claims against Bozel S.A. and Class 1B- General Unsecured Claims against Bozel, LLC).

The purpose of this Disclosure Statement is to provide creditors with information that (i) summarizes the Plan and alternatives to the Plan; (ii) advises creditors of their rights under the Plan; (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.  This Disclosure Statement contains important information regarding (a) the Debtors' history; (b) developments in these chapter 11 cases; (c) the Plan, including a summary and analysis thereof; and (d) considerations pertinent to acceptance or rejection of the Plan.  This Disclosure Statement is designed to provide holders of Impaired Claims that are entitled to vote to accept or reject the Plan with adequate information to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.  All creditors are encouraged to read this Disclosure Statement and its exhibits carefully and in their entirety before deciding to vote either to accept or reject the Plan.

### 1.3    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and would not be entitled to vote.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of claims in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if (i) at least one class of impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

In addition, if any Impaired Class of Claims or Equity Interests entitled to vote will not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to seek to have the Bankruptcy Court confirm the Plan under the cram-down provisions of section 1129(b) of the Bankruptcy Code.

Under the Plan, Allowed Administrative Expense Claims, Priority Tax Claims, Non-Priority Tax Claims and Allowed Fee Claims are unclassified, Unimpaired and will be satisfied in full. The acceptance of the Plan by Holders of these Claims is not required and the Debtors are not soliciting their votes. Holders of General Unsecured Claims against Bozel S.A. (Class 1A) and General Unsecured Claims against Bozel, LLC (Class 1B) are Impaired under the Plan and entitled to vote. The Debtors are asking that all holders of General Unsecured Claims, whether against Bozel S.A. or Bozel, LLC, vote to accept the Plan. The Plan cancels Intercompany Claims (Class 2) and Equity Interests in Bozel S.A. (Class 3A) and Equity Interests in Bozel, LLC (Class 3B). Holders of Intercompany Claims and Equity Interests will receive no distribution under the Plan, and are conclusively presumed to reject the Plan.

## ARTICLE II  OVERVIEW OF THE PLAN

### 2.1    *Introduction*

The Plan is the product of the effort by the Debtors to develop a plan that will enable Creditors to receive the maximum recovery possible in this case with the consent of the Impaired Classes.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO MAXIMIZE THE RECOVERY TO THEIR CREDITORS AND EQUITY INTEREST HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF

*MIA182,176,943v6*

THE DEBTORS, THEIR CREDITORS AND EQUITY INTEREST HOLDERS. THE DEBTORS THEREFORE URGE THOSE PARTIES ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

### 2.2    *Summary of Distributions*

Under the Plan, Claims against and Equity Interests in the Debtors are divided into Classes and will receive distributions and recoveries (if any) described in the table below. The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.

| Class | Sub-class | Type of Claim or Interest | Estimated Amount of Allowed Claims[1] | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| Unclassified | N/A | Administrative Claims | $0[2] | 100% | No |
| Unclassified | N/A | Priority Tax Claims | $0 | 100% | No |
| Unclassified | N/A | Fee Claims | $694,994 | 100% | No |
| Class 1 | 1A | Bozel S.A. General Unsecured Claims | $13,661,828 | 0.00%-12.40% | Yes |
| | 1B | Bozel, LLC General Unsecured Claims | $392,439 | 38.64-100% | Yes |
| Class 2 | 2 | Intercompany Claims | $0 | 0% | No |
| Class 3 | 3A | Equity Interests in Bozel S.A. | $0 | 0% | No |
| | 3B | Equity Interests in Bozel, LLC | $0 | 0% | No |

## ARTICLE III  OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders. A goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon, among

---

[1] As of the date hereof.

[2] This does not include the administrative claim filed by DGM Et Associes, the French law firm that provided legal services to Bozel Europe post-petition, in the amount of $96,843, which is anticipated to be subject to objection or motion for allowance.

3

others, a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

A plan and a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan may be disseminated to the holders of claims against or interests in a debtor in connection with the solicitation of their vote to accept or reject the plan under certain circumstances.

## ARTICLE IV  DEBTORS' HISTORY AND BACKGROUND

### 4.1    *The Debtors*

Bozel S.A. is a company limited by shares (a "société anonyme" or "S.A.") organized under the Grand Duchy of Luxembourg, and registered with the Luxembourg Trade and Companies Register under the number B107769.  Bozel is a holding company which, at the time of its Chapter 11 filing, owned substantially all of the stock in Bozel Mineração, S.A. (organized in Brazil) ("Bozel Brazil") and Bozel Europe S.A.S. (organized in France) ("Bozel Europe"), and continues to own Bozel, LLC (organized in the state of Florida).

Prior to the sale of Bozel Brazil and Bozel Europe to Japan Metals & Chemicals, Co., Ltd. ("JMC"), as described fully below, Bozel S.A., through its three operating subsidiaries on three continents, was a worldwide leader in the sale of calcium silicon ("CaSi").  In fact, immediately preceeding its filing for bankruptcy protection, Bozel S.A. sold over 40% of the world's CaSi powder output.  Bozel Brazil and Bozel Europe are manufacturing companies. Bozel Brazil produces primarily CaSi and cored wire, which is an industry-preferred ingredient in the production of high quality steel and steel alloys.  Bozel Europe produces primarily cored wire.  Bozel, LLC formerly marketed and distributed in the United States the products produced by Bozel Brazil.

Bozel S.A. is the sole member and manager of Bozel, LLC.

### 4.2    *Corporate History of Bozel S.A.*

Bozel S.A. is wholly-owned by Wellgate International Ltd. ("Wellgate"). Wellgate is a holding company organized in the British Virgin Islands ("BVI").  Its primary assets include its 100% ownerships of Bozel S.A. and PowerBras Energia Holding Ltda. ("PowerBras"), a Brazilian holding company with interests in coal deposits, mining assets and power generation equipment located in Brazil.  Though operated separately from the Bozel entities, certain Bozel entities have loaned money to PowerBras.

Bozel S.A. was created by the reverse merger of Luxco and Agroline S.A. ("Agroline") in February 2008.  Luxco was a Luxembourg holding company formed by Wellgate to facilitate the reverse merger.  Agroline was a UK Limited Company originally formed in 2004.  In August 2007, new Agroline directors were appointed including Michel Marengére ("Marengére"), who was also listed as "manager."  Shortly after the reverse merger, Agroline S.A. was renamed Bozel S.A.

4

(a)    **The Bozel Acquisition Transactions**

During the period from 2006 through July 2008, Marengére purchased certain of the Brazilian and French CaSi manufacturing assets and operations of Companhia Vale Do Rio Doce ("CVRD" or "Vale"), a large Brazilian based mining company.  The CaSi business was organized under several wholly owned subsidiaries of Vale, including Rio Doce Manganese Europe ("RDME"), Rio Doce Manganese S.A., Companhia Paulista de Ferro Ligas and Portonit Participacoes S/A.

In late 2006, Wellgate executed the original stock and asset purchase agreement with Vale for the French and Brazil CaSi businesses.  Ultimately, the agreement would be amended eleven times between December 2006 and the completion of the February 2008 acquisition of the Brazil CaSi business, followed by a second transaction in June 2008 for certain assets of Vale's French CaSi operations.

Although the February 2008 purchase of the Brazilian operations was for a stated price of $16.7 million, the Debtors' forensic analysis indicates that the total amount actually incurred, including fees, was $20.9 million. Based on the amendments to the stock purchase agreement, and funding schedules included in the financing documents, cash transferred to Vale was $9.6 million, and an additional $7.4 million of inventory was transferred to Vale by Portonit Participacoes at no charge.  In addition, Agroline repaid a $2.7 million loan from Vale to Portonit Participacoes, for total consideration of approximately $19.7 million.  Legal and financing costs were also incurred in connection with the transaction, totaling approximately $1.2 million.

In the second transaction, in June 2008, Bozel SA. completed the purchase of certain assets of Vale's CaSi operations in Dunkerque, France for approximately $6.7 million bringing the total expended on both transactions to approximately $26.4 million before fees and expenses.

(b)    **Bozel S.A.'s Operating Subsidiaries**

1)    *Bozel Brazil*.  Bozel Brazil owns and operates a factory producing CaSi and ferro alloy powders in Sao Joao Del Rey, Minas Gerais, Brazil. CaSi is a potent deoxidizer and desulfurizer utilized in the production of high grade steels. The production capacity of Bozel Brazil's three electric arc furnaces constitutes approximately one-third of the world's production capacity of CaSi.

2)    *Bozel Europe*.  Bozel Europe operates a CaSi cored wire facility in Dunkerque, France.  Cored wire, filled with CaSi, is a preferred method for delivering CaSi into the production process at mills producing high grade steel.

3)    *Bozel, LLC*.  In 2007, a third Bozel subsidiary, Bozel, LLC was formed in the United States.  This Florida-based company was originally owned by Spearhead Ltd Inc. ("Spearhead"), of which Marengére is the Chairman, President and Chief Executive Officer, which assigned its interest to Agroline in January 2008. This entity functioned as Bozel's North American sales arm, selling imported CaSi products from both Bozel Brazil and Bozel Europe to North American customers.  Throughout its existence, Bozel, LLC had no

5

employees in the United States, instead utilizing three independent contractors to manage all day to day operations of Bozel, LLC including: execute and expedite sales, manage customer relations, manage inventory and collect receivables.

### (c)   Financial History of the Debtors

From its inception in October 2007 until January 31, 2011, Bozel, LLC completed sales of CaSi materials totaling $19.2 million. Sales by Bozel, LLC represented approximately 10% of Bozel S.A.'s total sales during that same period. Product sold by Bozel, LLC was primarily sourced from Bozel Brazil. Sales to North American customers were largely on standard contracted terms and receipts were deposited into one of two Bozel, LLC bank accounts at Wachovia Bank. Marengére had sole control of the main customer depository at Wachovia Bank. Marengére would transfer funds for the operating expenses of Bozel, LLC from this account to the second account, the so-called "sundries" account, from which the independent contractor sales team had authority to pay the operating expenses of Bozel, LLC, including their fees, cost of warehousing and shipping goods, and other normal business expenses.

Over the course of its existence, Bozel, LLC received $20.6 million as payment for its North American sales, $2 million in loans from Bozel Brazil, $0.5 million in loans from Bozel Europe and $0.2 million from Spearhead. Of the total $23.3 million received, $2.1 million was transferred to the "sundries" account for payment of the direct expenses of the operations of LLC. From the available bank records, it appears the remaining $20.7 million of cash was disbursed by Marengére to a variety of recipients, not all for the apparent direct benefit of Bozel S.A. or its subsidiaries, and little if any for the direct benefit of Bozel, LLC. More importantly, Bozel, LLC at no time repaid any of the funds due to Bozel Brazil or its export agent, Empreendimento Comercial Industrical ("ECIL") for the purchase of the merchandise it sold, or the outstanding loans and interest accrued thereon. In addition, Bozel Europe paid certain expenses totaling approximately $0.5 million on behalf of Bozel, LLC which were never reimbursed.

As a direct result of Bozel, LLC's failure to repay funds due to Bozel Brazil and Bozel Europe, Bozel Brazil and Bozel Europe were unable to generate sufficient net cash to support their businesses, remain current on raw material purchases, perform timely preventative maintenance, or adequately address operational issues.

Bozel Brazil and Bozel Europe each have produced audited financial statements since their inception and the transactions described above have been duly recorded in their books and records. Bozel, LLC had no formal books and records and financial statements have been created by BDO based on information available, as has a proforma estimate of the financial position of Bozel S.A. as at the filing date and for the fiscal years 2007 through 2010.

Although Bozel Brazil, Bozel Europe and Bozel, LLC each have purportedly made accounting entries for these various inter-company transactions, it should be noted that, despite requests by the Examiner (as defined below) and subsequently by the Liquidator, no books and records of Bozel S.A. have been received or discovered, nor are any records available detailing the multitude of funds transfers made by Marengére to non-Bozel entities. It has also been determined that no United States federal or state income or corporate tax filings have been

made on behalf of Bozel S.A. in either Luxembourg or the United States or for Bozel, LLC in the United States.  Bozel, LLC has continued to pay corporate filing fees in Florida since its inception.

As a result of BDO's initial investigation into Marengére's diversion of funds from Bozel, LLC to himself and to other entities in which he holds an interest or with which he is aligned, the Liquidator, in consultation with his advisors, determined to commence a bankruptcy case for Bozel, LLC.  The Bankruptcy Code and Bankruptcy Rules provide the best investigative tools and legal authority through which to pursue the avoidance and recovery of some or all of those transfers, for the benefit of the creditors of the Bozel, LLC and, ultimately, Bozel S.A.

## ARTICLE V  SIGNIFICANT EVENTS DURING THE BANKRUPTCY

### 5.1    *The Bankruptcy Filings*

On April 6, 2010 (the "S.A. Petition Date"), Marengére caused Bozel S.A. to commence a bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

On January 5, 2011 (the "LLC Petition Date") the Debtors, upon the direction of the Liquidator, caused Bozel, LLC to commence a bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

These cases are jointly administered under the case number 10-11802 (AJG).

### 5.2    *The Corporate Governance Action*

Andrew D. Bickerton (the "Liquidator") was appointed liquidator of Wellgate pursuant to the BVI Insolvency Act, 2003 by The Eastern Caribbean Supreme Court in the High Court of Justice, Virgin Islands by order dated March 9, 2010 and entered March 10, 2010. Additionally, by resolution passed by Wellgate on April 7, 2010, the Liquidator was appointed the sole director of Bozel S.A.

On March 19, 2010, the Liquidator sent a directive by e-mail to Marengére, then Bozel S.A.'s sole director of record, informing him of the Liquidator's appointment.  The directive advised Marengére that, with the Liquidator's appointment, Marengére lacked statutory authority over Bozel S.A.  The directive further stated that Marengére should take "no actions" in relation to Bozel S.A. without the Liquidator's "express authorization and written approval." In defiance of these directives, three days later, Marengére executed a resolution on behalf of Bozel S.A. dated March 22, 2010, entitled "Consent in Lieu of Meeting of Directors," which purported to resolve, among other things, that Bozel S.A. file "as soon as practicable" a petition under chapter 11 of the Bankruptcy Code.  On the S.A. Petition Date, Marengére caused Bozel S.A. to commence this case.

On May 21, 2010, James L. Garrity, Jr. was appointed as examiner in this case (the "Examiner").  That appointment was confirmed by the Court on May 25, 2010.  The Examiner performed his duties, which included the procurement and review of records provided by Marengére.  The Examiner's appointment was terminated by the Court as of October 6, 2010.

*MIA182,176,943v6*

On May 7, 2010, the Liquidator and Crastvell Trading Limited ("Crastvell") commenced adversary proceeding no. 10-03249 against Bozel S.A. and Marengére seeking declaratory and injunctive relief (the "Adversary Proceeding"). On August 4, 2010, the Court issued an opinion (the "Opinion") in the Adversary Proceeding granting virtually all relief sought by the Liquidator and Crastvell. By the Order entered on August 6, 2010, the Court implemented its Opinion. The Adversary Proceeding was closed on August 9, 2010. The Order has never been appealed and accordingly has become final.

The Opinion and Order confirmed the validity of the corporate governance action taken by the Liquidator in removing Marengére as the director of Bozel S.A. and naming himself to that position. The Liquidator is now the sole director of Bozel S.A. and the only person authorized to act on its behalf. As Bozel S.A. is the sole member and manager of Bozel, LLC, the Liquidator is likewise the only person authorized to act on Bozel, LLC's behalf as well.

### 5.3    *Investigation into the Debtors' Finances*

Following the Court's Order dated August 6, 2010, the Liquidator, with the assistance of the Greenberg Traurig law firm and BDO Consulting Corporate Advisors, LLC ("BDO"), assessed the legal, financial and operational condition of Bozel S.A., Bozel Brazil, Bozel Europe and Bozel, LLC. In consultation with the management of Bozel Brazil and Bozel Europe, the Liquidator determined that there was an immediate need for a cash infusion to ensure the continued operations of Bozel Brazil and Bozel Europe. Specifically, in excess of $4 million dollars was required to pay supplier arrearages and to assure continued future supply in Bozel Brazil of its two primary raw material inputs, electricity and charcoal. An additional $4 million was required for maintenance and other working capital needs in order to operate Bozel Brazil and Bozel Europe through an expedited sale process that was likely to last through the first quarter of 2011. The Liquidator, in consultation with the management of Bozel Brazil and Bozel Europe, determined that if at least $4 million in debtor-in-possession ("DIP") financing was not secured by mid-December 2010, the Brazilian operations, where the bulk of the Debtors' enterprise value existed, would be in danger of potential shutdown leading to a likely wholesale liquidation of the business. The Liquidator determined that a sale of Bozel Brazil and Bozel Europe was the preferred course to provide the highest returns to the creditors.

### 5.4    *The Sale of Bozel Brazil and Bozel Europe*

### (a)    <u>Initial Marketing of Bozel S.A.'s Assets</u>

In conjunction with his legal and financial advisors, the Liquidator determined that a sale of Bozel S.A's stock in the Bozel Brazil and Bozel Europe coupled with securing DIP financing was in the best interests of Bozel S.A.'s estate and creditors.

Because it was necessary that several vital Brazilian supplier payments be made by mid-December 2010 to assure the continuity of operations and the maintenance of enterprise value, Bozel S.A. and its advisors immediately began soliciting sources of DIP financing as well as discussions with four entities (the "Potential Purchasers") who had expressed an interest in purchasing Bozel S.A.'s assets, as well as in making a DIP loan to Bozel S.A. Additional efforts to identify other third party sources of DIP financing from conventional loan sources proved

unsuccessful owing primarily to Bozel S.A.'s geographical diversity, the relatively small size of the required financing, the dispersed foreign location of the assets, questions as to ability to grant and perfect liens in foreign countries, and the deteriorated financial condition of the Bozel enterprise.

The Potential Purchasers, all of whom had significant knowledge Bozel Brazil's and Bozel Europe's business, included two strategic buyers and two financial buyers located on three continents. Bozel S.A. executed confidentiality agreements with each of the Potential Purchasers. Each Potential Purchaser was then offered due diligence materials, access to the management of the Bozel entities, and the opportunity to make site visits to Brazil and France.

On November 5, 2010, Bozel S.A. sent to each of the Potential Purchasers a request for a letter of intent stating the terms on which each Potential Purchaser would be willing to (i) make a DIP loan to Bozel S.A. and (ii) purchase Bozel S.A.'s stock in Bozel Brazil and Bozel Europe. All four Potential Purchasers submitted letters of intent.  Bozel S.A. and its advisors reviewed these offers and had subsequent conversations with each of the Potential Purchasers concerning their terms.

After reviewing the letters of intent and discussing terms with the Potential Purchasers, Bozel S.A., in conjunction with its financial and legal advisors, determined in its business judgment that the offer to provide DIP financing and to purchase Bozel S.A.'s assets made by JMC was superior to those offers made by the other three Potential Purchasers. In arriving at this conclusion, Bozel S.A. determined after careful consideration of all the offers received that JMC offered both the most favorable financing terms, and, subject to higher and better offers to be solicited in accordance with the proposed bidding procedures described herein, the highest purchase price for the shares of the companies that were being offered for sale.

(b)    **DIP Financing and the Subsequent Marketing and Sale of Bozel Brazil and Bozel Europe**

On December 7, 2010, the Court entered the *Interim Order Authorizing Debtor to Enter into Prepetition Credit Agreement and Granting Superpriority Status* [Docket No. 99]. This interim relief allowed Bozel S.A. to settle its accounts with its electricity supplier and order raw materials to assure operational continuity.  On December 21, 2010 the Court entered the *Final Order Authorizing Debtor to Enter into Prepetition Credit Agreement and Granting Superpriority Status* [Docket No. 108].

On December 30, 2010, the Bankruptcy Court entered the *Order Approving Bidding Procedures and Related Relief Regarding the Sale of Assets of Bozel S.A., and Notice Thereof*, [Docket No. 120] (the "Bid Procedures Order").  Pursuant to the Bid Procedures Order, the Bankruptcy Court (a) approved the bidding and auction procedures related to the sale of Bozel's interests in Bozel Brazil and Bozel Europe to JMC pursuant to the purchase agreement between Bozel and JMC, dated December 9, 2010 (the "Purchase Agreement"), or to a higher and better purchaser; (b) designated JMC as the "stalking horse" purchaser and (c) scheduled the auction ("Auction") and sale hearing (the "Sale Hearing").

Bozel S.A. considered engaging an investment banker to assist it in identifying additional potential buyers but determined in its business judgment that, given the range of offers it received from the Potential Purchasers, the financial capabilities and geographic diversity of the Potential Purchasers, and the specialized nature of the business and product, it would not be necessary or cost effective to do so. Bozel S.A. did not limit its sale activities to the Potential Purchasers, and pursued a comprehensive marketing process. Bozel S.A. placed notices of the proposed sale and the impending auction in the U.S. and international editions of the Wall Street Journal on November 21, 2010 as well as in the Wall Street Journal's on-line editions for a 30-day period also commencing November 21, 2010. In January 2011, Bozel S.A. published a notice in the Wall Street Journal of the auction to be held in February 2011. Bozel's internal marketing efforts produced an additional fourteen interested parties on four continents including additional financial buyers as well as significant international steel industry participants. Bozel S.A. signed confidentiality agreements with ten of those parties; provided due diligence materials to nine of those, facilitated site visits for four of the parties; and, continued negotiations with those four parties up until the bid deadline of January 30, 2011 and the Auction. Ultimately, one competing bid was received, and, at the Auction, no qualifying competing bids higher and better than JMC's stalking horse bid were received.

At the Sale Hearing held on February 9, 2011, the Bankruptcy Court (a) determined that the Auction held on February 8, 2011 was fair and reasonable and conducted in accordance with the Bid Procedures Order, and (b) approved the sale of Bozel's stock in Bozel Brazil and Bozel Europe to JMC pursuant to the Purchase Agreement. The Bankruptcy Court subsequently entered the *Order Approving Sale of Substantially All Assets of Bozel S.A. to Japan Metals & Chemicals Co., Ltd.* on February 10, 2011 [Docket No. 174] (the "Sale Order"). The sale closed pursuant to the terms of the Sale Order on February 17, 2011. The sales proceeds were sufficient to satisfy the secured claims on the assets subject to the sale.

### 5.5    *Claims Bar Dates*

On March 8, 2011, the Court entered the Bar Order. Pursuant to the Bar Order, creditors and equity holders were required to file proofs of claims or interests in the Debtors' chapter 11 cases by May 9, 2011, at 5:00 p.m. (the "General Bar Date"). In addition, governmental units (as defined in section 101(27) of the Bankruptcy Code) had to file proofs of claims by July 6, 2011, at 5:00 p.m. (the "Governmental Bar Date"). On April 29, 2011, the Court entered the Administrative Bar Order, which required each creditor, claimant and party-in-interest seeking payment of any administrative expense claim in these cases to file a motion pursuant to section 503(b) of the Bankruptcy Code or an original, written proof of such claim or interest by Tuesday, July 5, 2011 at 5:00 p.m. (the "Administrative Bar Date").

Applications by Professionals in respect of Fee Claims will be filed with the Bankruptcy Court within sixty (60) days after the Effective Date of the Plan. Any such application not filed within sixty (60) days after the Effective Date will be deemed waived and the Holder of such Claim will be forever barred from receiving payment on account thereof.

*MIA182,176,943v6*

## ARTICLE VI  SUMMARY OF PLAN PROVISIONS

**6.1**   *Introduction.*

The Plan is the product of diligent efforts by the Debtors and their professionals to formulate a plan that provides for a fair allocation of the Debtors' assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law.

The Debtors believe that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtors' creditors and equity interest holders.  The Debtors believe, and will demonstrate to the Bankruptcy Court, that the Debtors' creditors will receive more value under the Plan than any available alternative.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

**6.2**   *Unclassified Administrative Claims, Priority Tax Claims and Fee Claims*

Administrative Expense Claims and Priority Tax Claims are not classified in the Plan.  Holders of these Claims are Unimpaired by the Plan, are conclusively presumed to have accepted the Plan, and as such are not entitled to vote to accept or reject the Plan.

Pursuant to Article 3.1 of the Plan, the legal and equitable rights of the Holders of Administrative Expense Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise provided for in the Plan, as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, the Plan Administrator will pay to each Holder of an Allowed Administrative Expense Claim from Bozel S.A. Assets, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim (i) Cash equal to the amount of such Allowed Administrative Expense Claim or (ii) such other treatment as to which the Plan Administrator and the Holder of such Allowed Administrative Expense Claim will have agreed upon.

As described in Article 3.2 of the Plan, except to the extent that the holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim, if any, will, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of the Plan Administrator: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim from the Bozel S.A. Assets or the Bozel, LLC Assets, as the case may be, on the latest of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable; and (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; (ii) over a period ending not later than five (5) years

11

after the S.A. Petition Date or the LLC Petition Date, as applicable; and (iii) in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code).

Pursuant to Article 3.3 of the Plan, all unpaid U.S. Trustee Fees incurred before the Effective Date will be paid by the Debtors in full on the Effective Date prior to all other Administrative Expense Claims. In addition, all U.S. Trustee Fees incurred after the Effective Date will be timely paid by the Plan Administrator in the ordinary course as such U.S. Trustee Fees become due and payable, until the entry of a final decree. The Final Administrative Expense Claims Bar Date will not apply to U.S. Trustee Fees.

As provided in Article 4.2 of the Plan, each holder of an Allowed Fee Claim will receive 100% of the unpaid amount of such Allowed Fee Claim in Cash after such Fee Claim becomes an Allowed Claim.

### 6.3    *Classification and Treatment of Claims and Interests*

Class 1A - General Unsecured Claims against Bozel S.A. As soon as reasonably practicable after the later of (i) the Initial Distribution Date, and (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, the Plan Administrator will pay from Bozel S.A. Assets to each Holder of an Allowed General Unsecured Claim against Bozel S.A., in full satisfaction, settlement, release, extinguishment and discharge of such Claim, such Holder's Pro Rata Share of the Bozel S.A. Assets; provided, however, that no Holder of an Allowed Class 1A General Unsecured Claim will be entitled to receive more than the amount of such Allowed Claim; provided further that the Pro Rata share of the Bozel S.A. Assets allocable to the Holders of Class 1A Claims will be determined after calculating the payment owed to the Holders of Administrative Expense Claims and Allowed Fee Claims. Subsequent Distributions will be made by the Plan Administrator as Bozel S.A. Assets are available.

Class 1B - General Unsecured Claims against Bozel, LLC. As soon as reasonably practicable after the later of (i) the Initial Distribution Date and (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, the Plan Administrator will pay from Bozel, LLC Assets to each Holder of an Allowed General Unsecured Claim against Bozel, LLC, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, such Holder's Pro Rata Share of the Bozel, LLC Assets; provided, however, that no Holder of an Allowed Class 1B General Unsecured Claim will be entitled to receive more than the amount of such Allowed Claim; provided further that the Pro Rata share of the Bozel, LLC Assets allocable to the Holders of Class 1B Claims will be determined after calculating the payment owed to the Holders of Administrative Expense Claims and Allowed Fee Claims. Subsequent Distributions will be made by the Plan Administrator as Bozel, LLC Assets are available.

Class 2 – Intercompany Claims. In full settlement, satisfaction, release and discharge of any and all Intercompany Claims, all Intercompany Claims will be eliminated and discharged as of the Effective Date, by either offset, cancellation or contribution of such

MIA182,176,943v6

Intercompany Claims, or otherwise (as determined by the Debtors in their sole and absolute discretion.)

Bozel Brazil had a claim for $17,119,441, which includes $15,087,041 for inventory purchased by Bozel, LLC and $2,032,400 for loans made to Bozel, LLC in 2008. Bozel Europe had a claim for $297,345 for expenses paid by Bozel Europe on behalf of Bozel, LLC. These claims were retained by Bozel S.A. pursuant to the Sale Order.

Intercompany claims against Bozel S.A. include claims from of its subsidiaries, including Bozel Europe for $450,000 for expenses paid by Bozel Europe on behalf of Bozel S.A. and Bozel, LLC. Additionally, as described herein, from its inception in 2007 through the appointment of Andrew Bickerton as the sole managing director of its parent company, Bozel S.A., in August 2010, Marengére disbursed in excess of $20 million from the Bozel, LLC checking account under his control and authority. Although the available documentation to support these transactions is limited to the bank statements and copies of checks, it appears that approximately $19 million these transfers may have been made for or behalf of Bozel S.A., as well as numerous other Marengére-related interests.

All of these Class 2 Intercompany Claims will be eliminated and discharged as of the Effective Date pursuant to the Plan.

Class 3– Equity Interests. All Equity Interests in both Bozel S.A. (Class 3A) and Bozel, LLC (Class 3B) will be automatically extinguished and cancelled as of the Effective Date. No holder of an Equity Interest in Bozel S.A. will receive a distribution on account of such Equity Interest unless and until all other Allowed Claims against Bozel S.A. are satisfied in full, nor will any holder of an Equity Interest in Bozel S.A. receive a distribution on account of such Equity Interest unless and until all other Allowed Claims against Bozel, LLC are satisfied in full.

**6.4    *Acceptance or Rejection of the Plan***

Holders of Claims in Classes 1A and 1B (General Unsecured Claims) are Impaired by the Plan and will be entitled to vote to accept or reject the Plan. Any Holder of a Claim or Interest in an Unimpaired Class of Claims or Interests will not be entitled to vote to accept or reject the Plan.

Acceptance of the Plan by any Impaired Class of Claims will be determined in accordance with section 1126 of the Bankruptcy Code and the terms of the Solicitation Procedures Order.

Class 2 (Intercompany Claims), 3A (Equity Interests in Bozel S.A.) and 3B (Equity Interests in Bozel, LLC) will receive no Distribution under the Plan, and are conclusively presumed to have rejected the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, solicitation of votes of holders of Claims in Class 2 and Equity Interests in Classes 3A and 3B is not required.

The Debtors will have the right to request the Bankruptcy Court to confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

**6.5**    *Means for Implementation of the Plan*

Implementation on the Effective Date. The Plan will be implemented by the Plan Administrator in a manner consistent with the terms and conditions set forth in the Plan and the Confirmation Order.

Funding for the Plan. The Plan will be funded from the Bozel S.A. Assets and the Bozel, LLC Assets.

Vesting of Assets in the Debtors. As set forth in Article 7.3 of the Plan, as of the Effective Date, pursuant to the provisions of section 1141(b) and (c) of the Bankruptcy Code, the Bozel S.A. Assets will vest in Bozel S.A. free and clear of all Claims, liens, encumbrances, charges, membership interests and other interests, except as otherwise expressly provided herein or in the Confirmation Order, and subject to the terms and conditions of the Plan and the Confirmation Order. Likewise, on the Effective Date, pursuant to the provisions of section 1141(b) and (c) of the Bankruptcy Code, the Bozel, LLC Assets will vest in Bozel, LLC free and clear of all Claims, liens, encumbrances, charges, membership interests and other interests, except as otherwise expressly provided herein or in the Confirmation Order, and subject to the terms and conditions of the Plan and the Confirmation Order.

Continuing Existence. From and after the Effective Date, the Debtors will continue in existence for the purposes of (i) winding up their affairs as expeditiously as reasonably possible, (ii) liquidating, by conversion to Cash, or other methods, of any remaining Bozel S.A. Assets or Bozel, LLC Assets, as applicable, as expeditiously as reasonably possible, (iii) enforcing and prosecuting claims, interests, rights and privileges of the Debtors, including, without limitation, the prosecution of Causes of Action, (iv) resolving Disputed Claims, (v) administering the Plan, (vi) filing appropriate tax returns and (vii) performing all such other acts and conditions required by and consistent with consummation of the terms of the Plan.

Closing or Dismissal of the Chapter 11 Cases. When all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed, and all Bozel S.A. Assets and Bozel, LLC Assets have been liquidated and converted into Cash, and such Cash has been distributed in accordance with the Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator will seek authority from the Bankruptcy Court to close or dismiss the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. In the event of the dismissal of the Chapter 11 Cases, notwithstanding the provisions of section 349(b)(2) of the Bankruptcy Code, all orders of the Court will remain in effect.

Corporate Action. The Plan will be administered by the Plan Administrator and all actions taken under the Plan in the name of the Debtors will be taken through the Plan Administrator. Upon distribution of all Assets pursuant to the Plan and the filing by the Plan Administrator of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the final decree), the Debtors will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made therewith; provided, however, that the Debtors may take appropriate action to dissolve under applicable law. From and after the Effective Date, the

Debtors will not be required to file any document, or take any action, to withdraw their business operations from any states where the Debtors previously conducted business.

Winding Up Affairs.  Following the Effective Date, the Debtors will not engage in any business or take any actions, except those necessary to consummate the Plan and wind up the affairs of the Debtors.  On and after the Effective Date, the Plan Administrator may, in the name of the Debtors, actions to consummate the Plan and wind up the affairs of the Debtors without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions imposed by the Plan or the Confirmation Order.

Powers and Duties of the Plan Administrator.  The Plan Administrator will act for the Debtors in a fiduciary capacity as applicable to a board of directors or trustees, subject to the provisions of the Plan.  It is presumed that the Plan Administrator will utilize some portion of the approximately $119,000 remaining Cash at the Bozel, LLC level to fund its expenses, and that the Plan Administrator shall be entitled to one-third of any recovery based on the Avoidance Actions.  The powers and duties of the Plan Administrator will include the following:

(a)      acting on behalf of the Debtors in all adversary proceedings and contested matters (including, without limitation, on the behalf of Bozel, LLC in the pursuit of the Avoidance Actions), then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere and to settle, retain, enforce, dispute or adjust any claim and otherwise pursue actions involving Assets of the Debtor that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise waived or relinquished in the Plan;

(b)      investing Cash in accordance with section 345 of the Bankruptcy Code, and withdrawing and making Distributions of Cash to holders of Allowed Claims and paying taxes and other obligations owed by the Debtors or incurred by the Plan Administrator in connection with the wind-down of the Estates in accordance with the Plan;

(c)      engaging attorneys, consultants, agents, employees and all professional persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities;

(d)      executing and delivering all documents, and taking all actions, necessary to consummate the Plan and wind down the Debtors' business;

(e)      assisting with the Debtors' continued performance obligations under the Asset Purchase Agreement;

(f)      coordinating the turnover of property, if any, subject to rejected executory contracts or abandonment or liquidation of any retained assets;

(g)      coordinating the collection of outstanding accounts receivable;

(h)      coordinating the storage and maintenance of the Debtors' books and records;

*MIA182,176,943v6*

(i)    overseeing compliance with the Debtors' accounting, finance and reporting obligations;

(j)    preparing necessary operating reports and financial statements including United States Trustee reports;

(k)    overseeing the filing of final tax returns, audits and other corporate dissolution documents if required;

(l)    performing any additional corporate actions as necessary to carry out the wind down and liquidation of the Debtors;

(m)    paying the fees and expenses of the attorneys, consultants, agents, employees and professional persons engaged by the Debtors and the Plan Administrator, as well as all other expenses for winding down the affairs of the Debtors in accordance with a wind-down budget, or as otherwise agreed to by the Plan Administrator;

(n)    disposing of, and delivering title to others of, or otherwise realizing the value of all the remaining Assets;

(o)    objecting to, compromising and settling Claims;

(p)    implementing and/or enforcing all provisions of the Plan;

(q)    appointing and consulting with the Plan Administrator Advisory Board, replacing disqualified or resigned members thereof at his or her discretion, and reimbursing all expenses of the members of the Plan Administrator Advisory Board allowed under the Plan;

(r)    effectuating all activities necessary to conclude administration of, and closing or dismissing, the Chapter 11 Cases; and

(s)    such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or Bankruptcy Court order or as may be needed or appropriate to carry out the provisions of the Plan.

Plan Administrator Advisory Board.  The Plan Administrator may, at his or her discretion, appoint a Plan Administrator Advisory Board of no more than three (3) members in order to assist and advise the Plan Administrator in the administration of his or her duties.  The Plan Administrator will be uncompensated, except that the Plan Administrator will compensate the members of the Plan Administrator Advisory Board for reasonable out of pocket expenses incurred as a direct result of Plan Administrator Advisory Board activities.  The members of the Plan Administrator Advisory Board will not have any fiduciary duty to the Debtors.

### 6.6    *Distributions Under the Plan*

The Plan Administrator will make Distributions to holders of Allowed Claims as follows:

*MIA182,176,943v6*

from the Bozel S.A. Assets:

(a)     first to the U.S. Trustee to satisfy U.S. Trustee Fees;

(b)     second to holders of Allowed Administrative Expense Claims that were unpaid on the Effective Date;

(c)     next to holders of Priority Tax Claims, if any;

(d)     next to holders of Allowed Bozel S.A. Class 1A General Unsecured Claims following the Initial Distribution under the Plan; and

(e)     next to holders of Class 3A Equity Interests in Bozel S.A.; and

from the Bozel, LLC Assets:

(a)     first to the U.S. Trustee to satisfy U.S. Trustee Fees;

(b)     second to holders of Priority Tax Claims, if any;

(c)     next to holders of Allowed Bozel, LLC Class 1 B General Unsecured Claims following the Initial Distribution under the Plan,

(d)     next to Bozel S.A. as the holder of Class 3B Equity Interests in Bozel, LLC, for distribution pursuant to the Plan.

Cancellation of Instruments and Stock.  Pursuant to Article 7.11 of the Plan, on the Effective Date, the following will automatically be cancelled and extinguished, whether issued or authorized to be issued:  (i) any and all stock options; (ii) any and all warrants; and (iii) any instrument evidencing or creating any indebtedness or obligation of the Debtors.

Preservation of Causes of Action.  On the Effective Date, the Plan Administrator will be vested with authority and standing to prosecute the Causes of Action, including but not limited to, the Avoidance Actions on behalf of Bozel, LLC, and to compromise, settle, or litigate the Causes of Action.  A non-exhaustive list of the Causes of Action, including the known potential defendants and the nature of the Causes of Action is attached hereto as Exhibit C. Nothing in Article 11.3 of the Plan shall be construed to exculpate or provide any other protection in favor of any of the Debtors' employees, managers, officers, directors, shareholders, members, partners, agents, attorneys, investment bankers, financial advisors, or other professionals that were retained, employed or otherwise engaged by the Debtors prior to August 6, 2010.

Means of Cash Payment.  Cash payments made pursuant to the Plan will be in U.S. funds, except in the case of foreign creditors, who may be paid in their local currency at the discretion of the Plan Administrator, by the means, including by check or wire transfer, determined by the Plan Administrator.

17

*MIA182,176,943v6*

Delivery of Distributions.  Distributions to Holders of Allowed Claims will be made (i) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Plan Administrator; or (iii) if no Proof of Claim has been Filed and the Plan Administrator not received a written notice of a change of address, at the addresses reflected in the Bankruptcy Schedules, if any.

Partial Distributions.  The Plan Administrator, in his or her discretion, may issue partial or interim Distributions.

No Distributions Pending Allowance.  Notwithstanding any other provision of the Plan, no payment or Distributions by the Plan Administrator will be made with respect to all or any portion of a Disputed Claim unless and until all Avoidance Actions with respect to the Holder of such Claim and all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

Preservation of Right to Object to Claims.  The Plan Administrator will retain the right to object to any Claim within one hundred and twenty (120) days of the Confirmation Date, subject to further extension.

Disputed Claim Reserve.  On the Effective Date and prior to effectuating any Distributions pursuant to the Plan, each Debtor will establish, as segregated accounts, Administrative and Priority Disputed Claims Reserves and such other resources for Disputed Claims as may be necessary.  Notwithstanding any other provision of the Plan, the Debtors or the Plan Administrator, as appropriate, will withhold from the property to be distributed under the Plan, and will place in the appropriate reserves, a sufficient amount to be distributed on account of the face amount or estimated amount, as the case may be, of each Administrative or Priority Claim that is disputed, contingent or unliquidated, and that has not become an Allowed Claim as of the date of a distribution under the Plan.  For purposes of this provision the "face amount" of a Claim will be the amount set forth on the proof of such Claim, or if no proof of such Claim has been Filed, the amount of such Claim listed in the Schedules, or the amount requested in any application Filed pursuant to section 330 of the Bankruptcy Code.

Undeliverable Distributions.   Pursuant to Article 9.7 of the Plan, if any Distribution is returned as undeliverable, the Plan Administrator will make such efforts as he or she deems appropriate to determine the current address of the Holder of the Claim.  Amounts in respect of any undeliverable Distributions made by the Plan Administrator will be held in trust by the Plan Administrator until the Distributions are claimed or are deemed to be Unclaimed Property.

Unclaimed Property.  All Property distributed on account of Claims must be claimed within the later of 120 days after the Effective Date or the date such distribution is made to such Holder or, in the case of a distribution made in the form of a check, must be negotiated or a request for reissuance be made.  Nothing contained in the Plan will require the Debtors (or Plan Administrator) to attempt to locate any Holder of an Allowed Claim other than by reviewing the

Debtors' records.  Pursuant to sections 347(b) and 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property will be deemed Disallowed and the Holder of any Claim Disallowed is forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or their Properties.  Unclaimed Property will be distributed to Holders of Allowed Claims as applicable.

Time Bar to Cash Payments by Check.  Checks issued by the Plan Administrator on account of Allowed Claims will be null and void if not negotiated within 90 days after the date of issuance thereof, except as otherwise agreed by the Plan Administrator.  Requests for the reissuance of any check that becomes null and void pursuant to the Plan will be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom the check was originally issued.  Any Claim in respect of such voided check will be made in writing on or before the first anniversary of the date the check was issued, or will be discharged and forever barred.  The funds that would otherwise constitute the proceeds of such checks will revest in and become property of the Bozel, LLC or Bozel S.A. Estate as the case may be as Unclaimed Property in accordance with section 347(b) of the Bankruptcy Code, and be distributed as Unclaimed Property in accordance with the Plan.

Withholding and Reporting Requirements.  In connection with the Plan and all Distributions hereunder, the Plan Administrator will, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder will be subject to any such withholding and reporting requirements.  The Plan Administrator will be authorized to take any and all actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements.

No Distribution in Excess of Allowed Amount of Claim.  Notwithstanding anything to the contrary in the Plan, the aggregate Distribution or Distributions to a Holder of a Claim will not exceed the Allowed amount of such Claim.  If a Holder of an Allowed Claim receives a Distribution or Distributions under the Plan that exceeds the total amount of the related Allowed Claim, the Holder will, within five (5) Business Days, refund such excess amounts the Plan Administrator.  The Plan Administrator may seek the return of any such excess amounts by the commencement of a contested matter or adversary proceeding in the Bankruptcy Court.

De Minimis Distributions.  No Cash payment of less than ten dollars ($10.00) will be made by the Plan Administrator to any Creditor unless a request is made in writing to the Plan Administrator to make such a payment.

Setoff and Recoupment.  The Plan Administrator may, but will not be required to, setoff against or recoup from any Claim and the Distribution to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors or the Estates may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors, the Estates, the Plan Administrator of any claim, defense, right of setoff, or recoupment that any of them may have against the Holder of any Claim.

*MIA182,176,943v6*

**6.7**    *Conditions to Confirmation and Consummation*

The Plan will not be confirmed unless and until the Confirmation Order will have been entered and be a Final Order. The Effective Date will occur only if the Confirmation Order has become a Final Order and or has not been vacated, reversed, stayed, enjoined or restrained by order of a court of competent jurisdiction.

Pursuant to Article 8.3 of the Plan, if each of the conditions to the occurrence of the Effective Date have not been satisfied on or before the date which is no later than the first Business Day after sixty (60) days after the Confirmation Order is entered, or by such later date as is approved by the Court after notice and a hearing, then upon motion by any party in interest made before the time that each of the conditions has been satisfied or duly waived, the Confirmation Order may be vacated by the Court; provided, however, that, notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to occurrence of the Effective Date is either satisfied before the Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated by Final Order, the Plan will be null and void in all respects, and nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against the Debtors; or (b) prejudice in any manner the rights of any of the Debtors or other party in interest, including, without limitation, the right to seek a further extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code.

**6.8**    *Treatment of Executory Contracts and Expired Leases*

Pursuant to Article 10 of the Plan, all of the Debtors' executory contracts and unexpired leases will be deemed rejected on the Effective Date, except to the extent that the Debtors have (i) previously assumed or rejected an executory contract or unexpired lease or (ii) Filed or File a motion, prior to the Effective Date, to assume an executory contract or unexpired lease upon which the Bankruptcy Court has not ruled. Further, all parties to license agreements who are entitled to the election of remedies pursuant to section 365(n)(1) of the Bankruptcy Code will be deemed to have (i) elected treatment pursuant to 11 U.S.C. § 365(n)(1)(A) and (ii) waived their right to treatment pursuant to 11 U.S.C. § 365(n)(1)(B). However, prior to the Confirmation Hearing Date, such parties are entitled to a section 365(n)(1) election if they have notified the Debtors, in writing, of their election to proceed under subsection (B) and have waived their claims against the Debtors, as provided in 11 U.S.C. § 365(n)(2)(C)(i) and (ii).

**6.9**    *Effect of Confirmation*

Legal Binding Effect. Except as otherwise provided in Article VI of the Plan, the provisions of the Plan will bind all Holders of Claims and Interests and their respective successors and assigns, whether or not they accept the Plan. On and after the Effective Date, except as provided in the Plan, all Holders of Claims and Interests will be precluded from asserting any Claim against the Debtors, the Estates, the Plan Administrator, the Sole Director, or their respective property and Assets based on any transaction or other activity, act, or omission of any kind that occurred prior to the Effective Date.

*MIA182,176,943v6*

<u>Moratorium, Injunction, and Limitation of Recourse For Payment</u>.  Subject to Article 6.4 of the Plan, from and after the Effective Date, all Persons who have held, hold, or may hold Claims against, or Interests in, the Debtors are permanently enjoined from taking any of the following actions against the Estates, the Debtors, the Sole Director, the Plan Administrator, any of their respective employees, managers, officers, directors, agents, attorneys, investment bankers, financial advisors, or other professionals, or any of their respective property or other Assets on account of any such Claims or Interests, except for acts or omissions that constitute willful misconduct, gross negligence, fraud or violations of any applicable Rules of Professional Conduct: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; and (iv) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan or in the Confirmation Order will preclude (x) the Plan Administrator from pursuing any Causes of Action, (y) any Person from exercising their rights pursuant to or not inconsistent with the terms of the Plan, or (z) the Plan Administrator from exercising rights or remedies pursuant to and not inconsistent with the terms of the Plan.

<u>Exculpation and Limitation of Liability</u>.

(a)    The Sole Director, and professionals retained by the Sole Director, first became involved in these Chapter 11 Cases after Wellgate entered liquidation proceedings in the British Virgin Islands, as more fully described in the Disclosure Statement.  The Sole Director, and the professionals retained by the Sole Director, did not become involved in this case until after the S.A. Petition Date.  The Sole Director, and the professionals retained by the Sole Director, are not Insiders of the Debtors, as defined in section 101(31) of the Bankruptcy Code.

(b)    The Sole Director, the professionals retained by the Sole Director, will not be liable for any acts occurring prior to the Petition Date.  To the fullest extent permitted under, *inter alia*, section 1125(e) of the Bankruptcy Code and otherwise, no Holder of a Claim or Interest will have any right of action against the Sole Director, the Debtors, the Estates, the Plan Administrator, any of their respective employees, managers, officers, directors, agents, attorneys, investment bankers, financial advisors, or other professionals, or any of their respective property and assets for any act or omission in connection with, relating to, or arising out of their conduct of the Chapter 11 Cases, the promulgation of the Plan and Disclosure Statement, the pursuit of Confirmation thereof, the consummation thereof, or the administration of the Bozel S.A. Assets or the Bozel, LLC Assets, the Plan, or the property to be distributed under the Plan, except for acts or omissions that constitute willful misconduct, gross negligence, fraud or violations of any applicable Rules of Professional Conduct as determined by a Final Order.  For the avoidance of doubt, the foregoing exculpation will not apply to any of the Debtors' employees, managers, officers, directors, shareholders, members, partners, agents, attorneys, investment bankers, financial advisors, or other professionals that were retained, employed or otherwise engaged by the Debtors prior to August 6, 2010.

(c)    The Professionals retained by the Debtors, the Sole Director and all of their existing and former directors, managers, officers, attorneys, and other professional advisors, will have no liability for pursuing or failing to pursue any Causes of Action.

*MIA182,176,943v6*

No Discharge of Government Claims.  Nothing in the Confirmation Order or the Plan will effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority against the Estates, the Debtors, the Plan Administrator, or any of their respective employees, managers, officers, directors, agents, attorneys, investment bankers, financial advisors or other professionals, nor will anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceeding against any party for any liability whatsoever, including, without limitation, any claim, suit, or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor will anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state or local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority against the released parties.

## 6.10    *Post-Confirmation Jurisdiction*

Retention of Jurisdiction.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among other things, jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any application or request for payment of any Administrative Expense Claim, and the resolution of any objections to the allowance or priority of Claims;

(b)      hear and determine all Professionals' applications for compensation and reimbursement of expenses incurred in the Chapter 11 Cases;

(c)      determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action vested, and consider and act upon the compromise and settlement of any Claim against, or Causes of Action on behalf of, the Debtors;

(d)      enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions hereof, and all contracts, instruments, releases, and other agreements or documents created in connection therewith;

(e)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement hereof or the Confirmation Order;

(f)      hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

22

(g)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(h)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(i)    hear and determine all matters related to the property of the Estates from and after the Effective Date;

(j)    hear and determine such other matters as may be provided in the Plan or the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code; and

(k)    enter a final decree or decrees closing a Case or the Chapter 11 Cases.

### 6.11    *Miscellaneous Provisions*

Modification.    The Debtors may alter, amend, or modify the Plan or any Plan Documents under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation hereof, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects hereof so long as such proceedings do not materially or adversely affect the treatment of Holders of Claims or Interests under the Plan; provided, however, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or Order of the Bankruptcy Court.

Severability of Plan Provisions.    If, prior to Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Proponents (upon appropriate notice to one another), will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision hereof, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Interest Accrual.    No post-petition interest will accrue on any Claim or scheduled liability, except as set forth in the Plan.

Allocation of Plan Distributions between Principal and Interest.    To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution will, for federal income tax purposes, be

allocated to the principal amount of the Claim first, and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

Rules of Interpretation; Computation of Time. For purposes of the Plan, (i) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document as being in a particular form or containing particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (ii) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (iii) unless otherwise specified, all references in the Plan to sections, articles, and exhibits, if any, are references to sections, articles, and exhibits of or to the Plan; (iv) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion hereof; (v) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; and (vi) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules will apply. In computing any period of time prescribed or allowed by the Plan, unless otherwise specifically designated in the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

Successors and Assigns. The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person.

Governing Law. Unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, (i) the construction and implementation hereof and any agreements, documents, and instruments executed in connection with the Plan and (ii) governance matters will be governed by the laws of the State of New York, without giving effect to the principles of conflict of law thereof.

Notice of Effective Date. Within five (5) Business Days after the occurrence of the Effective Date, the Plan Administrator will File with the Bankruptcy Court and mail or cause to be mailed to all Holders of Allowed Claims in Class 1-A (Bozel S.A. General Unsecured Claims), Class 1-B (Bozel, LLC General Unsecured Claims), Class 2 (Intercompany Claims), Class 3A (Equity Interests in Bozel S.A.), and Class 3B (Equity Interests in Bozel LLC) a notice that informs such Persons of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the identity and contact information of the Plan Administrator, and the Plan Administrator Advisory Board, if any, and (iv) such other matters as the Plan Administrator deems appropriate or as may be ordered by the Bankruptcy Court. The aforesaid notice will also be served upon the U.S. Trustee and Filed with the Court.

## ARTICLE VII  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT,

MIA182,176,943v6

HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 7.1    *Taxation*

Pursuant to the Plan, each Holder of an Allowed Claim or Equity Interest receiving cash or property under the Plan will recognize gain or loss equal to the difference between the amount of any cash and the fair market value of any other property received by such holder and the basis which the holder has in such Allowed Claim or Equity Interest.  The character of any recognized gain or loss will depend upon the status of the holder, the nature of the Claim or Equity Interest and the period for which the Claim or Interest was held by the holder.  The basis of a holder in any property received under the Plan will be the fair market value of such property on the Effective Date of the Plan, and the holding period in such property received will begin on the Effective Date.

The federal, state and local tax consequences of the Plan are complex and, in some cases, uncertain.  In addition, the foregoing summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim or Interest in light of its particular circumstances and income tax situation.  Accordingly, each holder of a Claim or Equity Interest is strongly urged to consult with its own tax advisor regarding the federal, state, and local tax consequences of the Plan.

### 7.2    *Distributions to Holders of Claims*

The Plan is based on making distributions as provided under the priority scheme set forth in the Bankruptcy Code.  To this end, the Plan provides that all Allowed Administrative Claims and Priority Claims will be paid or satisfied in full prior to the making of distributions to holders of Allowed Claims in Class 1.

### 7.3    *Objections to Classification*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

### 7.4    *Certain Bankruptcy Law Considerations*

### (a)    <u>Risk of Non-Confirmation of the Plan</u>

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  However, there can be no guarantee that the Bankruptcy Court will reach the same conclusion.

*MIA182,176,943v6*

(b)      **Risk of Non-Occurrence of the Effective Date**

The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied although the Debtors do not anticipate the same.

(c)      **Appeal of the Confirmation Order**

The Confirmation Order may be the subject of an appeal.  If the Confirmation Order is vacated on appeal (assuming an appeal could be taken and such appeal would not be rendered moot due to substantial consummation of the Plan prior to prosecution), the Plan would fail.

## ARTICLE VIII  CONFIRMATION OF THE PLAN

### 8.1     *Confirmation Hearing*

The Bankruptcy Court will schedule a Confirmation Hearing and direct that objections, if any, to confirmation of the Plan be served and filed on or before a date certain. The Debtors will provide notice of the date of the Confirmation Hearing and objection deadline in accordance with the Bankruptcy Code, the Bankruptcy Rules and orders of the Bankruptcy Court.  The date of the Confirmation Hearing  may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

### 8.2     *Best Interests Test*

Notwithstanding acceptance of the Plan by each Impaired Class, the Bankruptcy Court must also determine that the Plan is in the best interests of each Holder of an Impaired Claim or Interest that has not voted to accept the plan.  Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test of Bankruptcy Code section 1129(a)(7) requires that the Bankruptcy Court find that the Plan provides to each Holder of such Claim or Interest a recovery on account thereof that has a value at least equal to the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To estimate the recovery of an Impaired Holder of a Claim or Interest under a chapter 7 liquidation, the Bankruptcy Court first determines the aggregate dollar amount that would be available if the chapter 11 case were converted to a chapter 7 case and the assets of the Debtors liquidated by a chapter 7 trustee.  The liquidation value would consist of the net proceeds of the disposition of the Assets and Cash held by the Debtors, reduced by the additional increased costs of liquidation and the administrative claims that would arise in a chapter 7 liquidation case but that do not arise in a chapter 11 case.

For purposes of the Plan, the Debtors have assumed that both the Plan Administrator and the chapter 7 trustee would be entitled to 1/3 of any recovery from the Avoidance Actions.   The liquidation itself may trigger certain priority claims, which must be paid out of liquidation proceeds before the balance is made available to pay other claims.

26

In a chapter 7 liquidation, Holders of Claims would likely receive a lesser distribution from the Debtors than under the Plan. Because the Plan calls for the payment of a greater distribution to Holders of Claims than would be paid in a chapter 7 liquidation, the Debtors believe that the Plan is the more favorable alternative. Accordingly, the Debtors submit that the Plan satisfies the best interests test set forth in section 1129(a)(7) of the Bankruptcy Code.

A liquidation analysis is annexed hereto as <u>Exhibit B</u> to assist interested parties in ascertaining whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. Because the amount of potential litigation proceeds is unknown, the liquidation analysis includes a range of possible recoveries as a result of the Causes of Action, including the Avoidance Actions. However, while it is clear that recoveries from future litigation may provide a substantial benefit to Holders of Allowed Claims, it is unclear how much those recoveries may be.

### 8.3    *Feasibility*

As a condition to Confirmation, Bankruptcy Code section 1129(a)(11) requires that the Debtors show that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation or reorganization is a component of the Plan.

The Plan provides for the Debtors' Assets to be liquidated for the benefit of Holders of Claims in the manner and on the terms set forth in the Plan. Accordingly, the Debtors submit that the requirements of Bankruptcy Code section 1129(a)(11) are inapplicable to the Debtors' Cases.

## ARTICLE IX  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 9.1    *Federal Income Tax Consequences in General*

The following summary addresses certain material federal income tax consequences of the implementation of the Plan to holders of Allowed Claims in Class 2 and 3. The summary is based upon the Debtors' interpretation of the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("<u>IRS</u>"), all of which are subject to change, possibly with retroactive effect. Due to the complexity of certain aspects of the Plan and differences in the nature of the Claims and Interests of the various holders thereof, their taxpayer status, residence and methods of accounting and prior actions taken by such holders with respect to their Claims and Interests, the tax consequences described below are general in nature and are subject to significant considerations applicable to each holder of an Allowed Claim in Class 1A and 1B.

The federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors' interpretation of the federal income tax consequences set forth herein is not binding on the IRS, and the Debtors have not requested, and do not intend to request, an administrative ruling from the IRS with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this

Disclosure Statement will be acceptable to the IRS.  No opinion of counsel has either been sought or obtained with respect to the federal, state, local or foreign tax aspects of the Plan. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Additionally, changes in the facts or circumstances relating to the consummation or operation of the Plan could likewise affect the tax consequences to such parties.

This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all of the federal income tax consequences of the Plan.  This summary also does not purport to address the federal income tax consequences of the Plan to taxpayers subject to special treatment under the federal income tax laws, such as banks, governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual funds, regulated investment companies, foreign corporations, and foreign persons.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR INTEREST.  ANY U.S. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (I) IS NOT INTENDED TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES IMPOSED ON SUCH PERSON AND (II) WAS WRITTEN IN CONNECTION WITH THE MARKETING OR PROMOTION OF THE PLAN.  IT IS STRONGLY RECOMMENDED THAT EACH HOLDER OF A CLAIM OR INTEREST CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

A.    *Federal Income Tax Consequences to the Debtors*

1.    Cancellation of Indebtedness

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year.  Section 108 of the Tax Code provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the Bankruptcy Court or is pursuant to a plan approved by the Bankruptcy Court.

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer.  The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers.  Attribute reduction is calculated only after the tax for the year of discharge has been determined Section 108 of the Tax Code further provides that a taxpayer does not realize COD

28

income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

**B.**     ***Federal Income Tax Consequences to Holders of Allowed Claims in Class 1A and 1B***

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim in Class 1A and 1B will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States. The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

1.     <u>Receipt of Cash and Property by Holders of Allowed Claims in Class 1A and 1B</u>

Generally, a holder of an Allowed Claim in Class 1A and 1B will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim. In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

2.     <u>Receipt of Interest</u>

Pursuant to the Plan, consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest.   However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.  Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on such Allowed Claims may be treated as receiving taxable interest, to the extent of any consideration they receive under the Plan that is allocable to such accrued but unpaid interest.  Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

3.     <u>Character of Gain or Loss</u>

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the

29

nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes may attract differing treatment); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.

4.    Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding.

**C.    *Importance of Obtaining Professional Tax Assistance***

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IN ACCORDANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE IN CIRCULAR 230, UNLESS EXPRESSLY STATED OTHERWISE IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS), ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE TAX CODE OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR OTHER MATTER ADDRESSED HEREIN.

*MIA182,176,943v6*

## ARTICLE X  CONCLUSION

The Debtors believe that the Plan is in the best interests of their creditors and equity holders and therefore urges the holders of Claims in Class 1A and 1B to vote in favor of the Plan.

Dated: November 1, 2011                          **BOZEL S.A., DEBTOR**


                                                 By:  */s/ Andrew D. Bickerton*
                                                      Andrew D. Bickerton
                                                      Sole Director

                                                 **Bozel, LLC, Debtor**


                                                 By:  */s/ Andrew D. Bickerton*
                                                      Andrew D. Bickerton
                                                      for Bozel S.A.,
                                                      Sole Member and Manager

GREENBERG TRAURIG, LLP


By:  */s/ Allen G. Kadish*
     Allen G. Kadish
     Kaitlin R. Walsh
     200 Park Avenue
     New York, New York 10166
     Telephone:  (212) 801-9200
     Facsimile:  (212) 801-6400
     kadisha@gtlaw.com
     walshkr@gtlaw.com

               and

     Mark D. Bloom
     333 Avenue of the Americas, Suite 4400
     Miami, Florida 33131
     Telephone: (305) 579-0500
     Facsimile: (305) 579-0717
     bloomm@gtlaw.com

     Attorneys for Debtors
     Debtors in Possession